

# THE ATTORNEY GENERAL

## OF TEXAS

**AUSTIN, TEXAS 78711**

CRAWFORD C. MARTIN
ATTORNEY GENERAL

September 11, 1969

Hon. Frank C. Erwin, Jr.              Opinion No. M-466
Chairman, Board of Regents
University of Texas System        Re: Whether the Board of Regents
900 Brown Bldg.                        of The University of Texas
Austin, Texas                          System has the authority to
                                       declare null and void a degree
                                       that the Board conferred in
                                       1954 and to direct officials
                                       of The University of Texas at
                                       Austin to strike the name of
                                       the recipient of the degree
                                       from the names of Ph.D. grad-
                                       uates at that institution,
Dear Mr. Erwin:                        and related questions.

        By recent letter you have requested an opinion
concerning the above stated matter. We quote from your letter
as follows:

        "On May 29, 1954, The University of Texas at Austin
    awarded a graduate student at that institution
    the degree of Doctor of Philosophy, based in part
    on the submission to and approval by a faculty
    committee of a dissertation.

        "In 1968 serious allegations were made
    regarding the validity of the doctoral dissertation
    submitted in partial fulfillment of the require-
    ments for that Doctor of Philosophy degree
    awarded in 1954. In order to investigate those
    allegations, the President of The University of
    Texas at Austin appointed an Advisory Committee,
    consisting of six faculty members of The Univer-
    sity of Texas at Austin, and requested the
    committee to submit recommendations regarding
    the actions, if any, that the University should

- 2313 -

take in the matter. The committee found probable cause to believe that regulations of The University of Texas at Austin had been violated in the submission of the dissertation in 1954, and on the advice of the committee, the President of the University appointed a Faculty Hearing Committee to conduct a hearing on two charges: (1) Did the dissertation conform to the University's requirements for honesty in written work? (2) Was the dissertation of the quality required by the Graduate School for an acceptable doctoral dissertation?

"The Hearing Committee found unanimously that (1) the 1954 dissertation was 'mainly plagiarism,' (2) that the dissertation 'failed to meet the standards of quality required for a doctoral dissertation,' and that the dissertation was 'not acceptable for the award of the Ph.D. degree.'

"All appropriate officials of The University of Texas at Austin and The University of Texas System have concurred in the findings of the Hearing Committee and have unanimously recommended that the Ph.D. degree in question be declared null and void and that the appropriate officials of the University of Texas at Austin be directed to strike the name of the recipient of the degree from the list of Ph.D. graduates of that institution. That unanimous recommendation is presently before the Board of Regents for consideration and final action.

"The Board of Regents respectfully requests your opinion on the following questions:

"(1)  Under the facts set out above, does the Board of Regents have the authority to declare null and void the Ph.D. degree that it conferred in 1954 and to direct officials of The University of Texas at Austin to strike the name of the recipient of the degree from the names of Ph.D. graduates at that institution?

Hon. Frank C. Erwin, Page 3 (M-466)

"(2) If it were determined that the faculty committee that approved the dissertation in 1954 conducted its work in a negligent manner, would such negligence estop the Board of Regents from declaring the degree null and void and from directing officials of The University of Texas at Austin to strike the name of the recipient of the degree from the names of Ph.D. graduates at that institution?

"(3) Is the Board of Regents barred by any statute of limitation or by the doctrine of laches from taking the actions recommended by the Hearing Committee and concurred in by the University administration?"

It should be noted at the outset that the legal problems raised by your request are unique to the jurisprudence of this state. We were unable to find a single reported case in this jurisdiction, or any foreign jurisdiction where a college degree has been conferred and then subsequently taken away by the conferring authority.

The Board of Regents of the University has been given authority by Article 2585, Vernon's Civil Statutes to confer degrees and grant diplomas.

Article 2585 is quoted, in part, as follows:

"...they shall have power to regulate the course of instruction and prescribe, by and with advice of the professors, the books and authorities used in the several departments, and to confer such degrees and to grant such diplomas as are usually conferred and granted by universities."

Pursuant to the above quoted article, the board of regents has promulgated various rules and regulations in general and relating to requirements for degrees for undergraduates and graduate students.

Relative to the facts at hand, we quote from pertinent rules and regulations in effect in 1953 and regulations in effect in 1953 and 1954:

### "Scholastic Dishonesty

Honesty being the foundation of all good citizenship, the student should maintain a high standard of honor in his scholastic work. He should avoid all forms of scholastic dishonesty, especially the following:

"Plagiarism.---The appropriation of passages, either word for word or in substance, from the writings of another and the incorporation of these as one's own in written work offered for credit. It is always assumed that the written work offered for credit is the student's own unless proper credit is given the original author by the use of quotation marks and footnotes or other explanatory inserts.

"Collusion.---Working with another person in the preparation of notes, themes, reports, or other written work offered for credit unless such collaboration is specifically approved in advance by the instructor.

"Cheating on an examination or a quiz.-- Giving or receiving, offering or soliciting, information; or the use of prepared material in an examination or a quiz. (See 'Examinations,' p. 65.)

"Persons guilty of scholastic dishonesty are usually penalized by suspension."

"7. Doctoral dissertaion.-- A doctoral dissertation is required of every candidate. The dissertation must give evidence of ability to do independent investigation in the major field, and it must itself constitute a contribution to knowledge. It must be accepted by the candidate's supervising committee, though the committee may appoint a subcommittee to pass on the dissertation. Sixty calendar days before the commencement at which the doctoral degree is to be awarded, the candidate must present two final copies of the dissertation (unbound) to the supervising professor, who shall notify the Dean of the Graduate

School of its receipt. The members of the supervising committee have thirty calendar days to read the dissertation. After all members of the committee (or an authorized subcommittee) have read the dissertation, they may sign a notice of acceptance for the purpose of examining the student on the dissertation. This examination is the final oral examination for the doctor's degree. The final oral examination includes the dissertation and the field of the dissertation and such other parts of the student's program as the supervisory committee may determine. After successful completion of the final oral examination, the approval sheets for the doctoral dissertation and the official recommendation to the Dean of the Graduate School are signed. The student then arranges to have the original and first carbon copy (plus a second carbon copy for an engineering student) bound promptly in approved style and deposited in the office of the Dean of the Graduate School.

"9. Summary of routine.--(1) Admission to the Graduate School through official transcripts of previous work in other institutions sent to the Registrar; registration course card from the Office of the Registrar; and registration by the graduate adviser of the student's major field. (2) Admission to candidacy by the major department or committee with the approval of the Dean. (3) Selection of a supervising professor and filling out a thesis information card, showing the field of the dissertation as approved by the supervisor, filed in the Dean's office. "(4) Submission of a Record of Work to the secretary to the Dean, whereupon the supervising committee will be appointed by the Dean. (5) Passing of foreign language examinations by the beginning of the last full year of graduate work (or the last two full years if the department so specifies). Blanks to present to examiners for certification of results should be secured from the secretary in the Dean's office. (6) Notice of expected graduation in June, given

by filing a diploma name card in the Dean's office
when an applicant registers in the session
in which he expects to get his degree.
(7) Passing of written major and minor examina-
tions conducted by the supervising committee at
dates set by the committee.
(8) Submission of two unbound copies of the disser-
tation to the supervising committee by April 1.
Two bound copies of the dissertation approved by
the committee to be filed in the office of the
Dean not later than May 1.

"(Each candidate must submit to the office
of the Dean with the dissertation two months before
the degree is to be conferred enough copies of
a brief abstract of his dissertation to allow
two copies to be filed in the Dean's office and
one to be sent to each member of the supervisory
committee. He must also submit two separate
copies of the biographical sketch.)

"(9) Formal request for the final oral
examination, signed by the chairman, filed in
the office of the Dean for his approval.

"(10) Written report, signed by the super-
vising committee with respect to the dissertation
and the final written and oral examinations, filed
in the Dean's office for final approval by the
Dean."

Article 2585 does not expressly authorize the Board
of Regents to take away a degree once conferred, and we are
unable to find any board rule or regulation expressly conferring
such authority upon the university.

Therefore, if such authority exists, it would have
to exist due to implied power conferred by Article 2585, or exist
in some contractual right between the University and the
degree recipient in question.

The extent of implied power inherent in an adminis-
trative agency is well stated in Corzelius v. Railroad Commission,
182 S.W.2d 412 (Tex.Civ.App. 1944) no writ, at page 415:

"The general rule is well settled that
boards or commissions which are creatures of

the statutes, can exercise ony such authority
as is conferred upon them by law in clear and
express language and that authority will not be
construed as being conferred by implication...
It is equally well settled, however, that when
a statute imposes a mandatory duty upon a govern-
mental agency to carry out the express and specifi-
cally defined purposes and objectives stated in
the law, such statute carries with it by necessary
implication the authority to do whatever is
reasonably necessary to effectuate the legislative
mandate and purpose."

It is our opinion that Article 2585 does not impose
a mandatory duty upon the Board of Regents to confer or to
grant any particular degree or diploma to any graduating students.
Therefore, it is further our opinion that the Board of Regents
has no implied authority, pursuant to Article 2585, to annul
a degree once conferred. The power of an administrative body
cannot be derived by inference or implication. Board of
Ins. Commissioner's of Texas v. Guardian Life Ins. Co. of
Texas, 142 Tex. 630, 180 S.W.2d 906 (1944); 73 C.J.S. 372,
Public Admin. Bodies, etc., Sec. 50.

However, the University of Texas does have contractual
authority as declared by the authorities in the conferring or
withholding of a College degree. The courts deem this to be
a matter of contract law subject to recognized statutory and
common law.

"Ordinarily, one matriculating at a college
or university establishes a contractual relationship
entitling him on compliance with reasonable regu-
lations as to scholastic standing, attendance
deportment and payment of tuition to pursue
his selected course of study to completion and
to receive a degree or certificate awarded for
successful completion of such course;..." 14
Corpus Juris Secundum, Colleges and Universities,
Section 8, pp. 1337-1338.

Texas courts have recognized this general rule; holding
that the rules and regulations set forth in a college catalog
constitute a written contract between the college and the

student. <u>Vidor v. Peacock</u>, 145 S.W. 672, (Tex.Civ.App. 1912) no writ; <u>Texas Military College v. Taylor</u>, 275 S.W. 1089, (Tex.Civ.App. 1925) no writ; See also, <u>S.M.U. v. Evans</u>, 115 S.W.2d 622, 131 Tex. 333, (1938).

We are of the opinion that the prior approval being an exercise of conferred discretionary power to the Board of Regents, to the prior committee and to the faculty as provided by statute,was conclusive in the absence of bad faith, or abuse of discretion, or a finding of fraud or false representation. 14 Corpus Juris Secundum, Colleges and Universities, Section 8, p. 1338; <u>Edde v. Columbia University</u>, 8 Misc 2d 795, 168 N.Y.S.2d 643, 1957 (affirmed 175 N.Y.S.2d 556; <u>Foley v. Benedict</u> 122 Tex. 193 55 S.W.2d 805, 86 A.L.R. 477 (1932).

The court in <u>Foley v. Benedict</u> supra stated:

"A student who is admitted to the University receives the privilege of attending that institution subject to the reasonable rules and regulations promulgated by the board of regents and existing at the time of his entrance into the school. The educational facilities of state-supported institutions of higher learning are at the disposal of the average student engaged in a particular field of study, and a standard of excellence which the average student in a particular field of study is able to satisfy is not an unreasonable regulation. It follows that a student who is unable to maintain and meet the standard of proficiency required is not entitled to continue to attend a state-supported institution, provided the standard required is not unreasonable and arbitrary. A rule which refuses readmission to a student who has failed to meet a standard of proficiency which the average student in the particular field of study is able to satisfy, is not unreasonable, where the facilities of the school are inadequate to accommodate all who are eligible to apply therefor."

The Court concluded:

"The Legislature of this state having lodged the power with the board of regents to

enact rules and regulations as may be necessary
for the successful management and government of
the University, they shall have power to adopt
such rules and to regulate the course of instruc-
tion, and prescribe, by and with the advice of the
faculty, the books and authorities used in the
several departments. That authority rests with
the board of regents and the faculty as provided
for by statute; and, if a change or modification
is desired in the rules and regulations, it is a
matter for the consideration of the Legislature.
The courts will not interfere therewith in the
absence of a clear showing that they have acted
arbitrarily or have abused the authority vested in
them..." (emphasis added).

The board of regents in awarding the degree of Doctor
of Philosophy based on the submission to and the approval by a
faculty committee of a dissertation exercised the authority
vested in the board of regents and the faculty as provided
by statute. Foley v. Benedict supra. Accordingly, the
recipient of the degree has received an award in the nature of
a property right which in our opinion is protected by due
process. The Legislature has not seen fit to prescribe an
administrative procedure whereby degrees awarded students may
be cancelled or rescinded by the administrative board. In
the absence of such authority, it is our opinion that such
degree can only be set aside or annulled by a Court of competent
jurisdiction rather than by an administrative decision. However,
this does not preclude the University from taking the legal
position that by reason of the alleged fraud it will no longer
recognize the degree in question and insofar as it is
concerned has cancelled the same. Yet the taking of such
position does not alter the legal rights of the degree recipient
nor have any binding legal effect as to third parties.

In view of the foregoing disposition of this matter,
we shall defer answering the second and third questions and
leave these for decision in a court of competent jurisdiction
in the event litigation is to be pursued.

## S U M M A R Y

The Board of Regents of the University of Texas system does not have statutory authority to annul a degree previously conferred in the exercise of authority granted the board of regents and the faculty by the Legislature of the State of Texas. Such degree can only be set aside or annulled by a court of competent jurisdiction. This opinion, however, is not to be interpreted to the effect that the University is precluded from taking the legal position that the degree was fraudulently obtained and is cancelled insofar as the University is concerned. The taking of such a position in itself does not alter the legal rights of the recipient to the degree nor have any binding legal effect as to third parties.

Very truly yours,

CRAWFORD C. MARTIN
Attorney General of Texas

Prepared by John Reeves
Assistant Attorney General

APPROVED:
OPINION COMMITTEE

Kerns Taylor, Chairman
George Kelton, Vice-Chairman
Sarah E. Phillips
James McCoy
Rick Fisher
Wardlow Lane

MEADE F. GRIFFIN
Staff Legal Assistant

HAWTHORNE PHILLIPS
Executive Assistant

NOLA WHITE
First Assistant